401 So.2d 1296 (1981)
Mae Rosie HOLLIDAY
v.
WEST POINT MUNICIPAL SEPARATE SCHOOL DISTRICT.
No. 52754.
Supreme Court of Mississippi.
August 5, 1981.
*1297 Bennie L. Turner, Randolph Walker, Walker & Turner, West Point, for appellant.
Thomas M. Tubb, Tubb, Stevens & Morrison, West Point, for appellee.
Before PATTERSON, C.J., and SUGG and BROOM, JJ.
BROOM, Justice for the Court:
Reassignment of appellant Mae Rosie Holliday from the position of school principal to the position of administrative assistant in the office of the superintendent of West Point Municipal Separate School District (appellee herein) forms the background to this case appealed from the Chancery Court of Clay County, Mississippi. On appeal she argues (1) that she was deprived of her constitutional due process and statutory rights, and (2) that the evidence presented by the school was insufficient to support her reassignment. We affirm.
On September 18, 1979, school district superintendent Griffin notified Holliday that she was being relieved of her duties as principal and reassigned as an administrative assistant in the superintendent's office continuing at her present salary. One day previously the school board had approved Holliday's reassignment. She sued in federal court for a preliminary injunction prohibiting her removal until she was granted an impartial hearing, which court ordered that she receive a due process hearing pursuant to Mississippi Code Annotated § 37-9-59 (Supp. 1980). By letter dated January 21, 1980, Griffin notified Holliday that the hearing officer would be the University of Mississippi's Dr. Joseph Blackston who set the public hearing for February 6 and 7 in the Clay County Courthouse. The charges alleged that she was incompetent and derelict in her duties in the following areas: (1) in preparing for the opening of the school term, specifically her: (a) failure to schedule the sixth grade students according to the Office of Civil Rights (OCR) Guidelines, (b) failure to issue textbooks until after the second week of classes began, and (c) failure to provide prompt lunch service to qualified students; (2) in resolving parents' complaints, more particularly a charge against one of the teachers, her sister, for not adequately testing the students; (3) in failing to use correct grammar in speaking and writing and in communicating with parents and students; and (4) in failing to maintain the standard of education at Central School.
The school district presented testimony from Griffin that Holliday was assistant principal of Central School when he became superintendent in 1976. In 1977 the principal's office at Central School became vacant and he recommended Holliday for the position primarily because of a federal court order in effect which required that any administrator or principal "who was demoted under the desegregation court order ... be offered and have the opportunity to turn down the first like position that became available."
In a letter dated March 8, 1977, however, Griffin and the board appointed Holliday to the vacancy provided:
Our recommendation of you for the position and the election of you by the Board of Trustees provides that you display marked improvement in the following areas:
1. Oral and written communication;
2. Recognizing, diagnosing, and prescribing methods of improving ineffective teachers and teaching techniques;

*1298 3. Staff development;
4. Recognizing and demanding high standards of education; and
5. Working harmoniously with the school community, staff, and administration.
At the conclusion of the termination hearing, Dr. Blackston rendered his opinion on March 19, 1980, affirming Holliday's removal and reassignment. On August 11, 1980, Chancellor Brand affirmed the action of the Board of Trustees and the hearing officer and Holliday appeals.
There is only one issue presently before us: DID THE CHANCELLOR, BASED UPON THE RECORD COMPILED AT THE TERMINATION/REASSIGNMENT HEARING, AND UPON HOLLIDAY'S CONTRACT OF EMPLOYMENT, COMMIT REVERSIBLE ERROR IN UPHOLDING THE HEARING OFFICER'S AFFIRMANCE OF THE BOARD'S DECISION TO REMOVE AND REASSIGN HOLLIDAY? Deciding this issue requires a review of the testimony and charges raised at the hearing. According to Griffin, prior to the school board's action on September 17, he had received numerous letters from concerned sixth grade parents (Central School has all of the sixth grade students for the entire school district) protesting the conditions at Central School. The parents complained that textbooks had not been issued, and that their children's schedules had been repeatedly changed. After reviewing the complaints, the board approved Holliday's removal and reassignment as an administrative assistant for administrative services in the superintendent's office.
Testimony given at the hearing established at least by substantial evidence that Holliday did not properly cope with the problem of scheduling students.
Rev. John Bacot, a Presbyterian minister in West Point, also testified. Of Rev. Bacot's three children, a daughter was in the sixth grade at Central School. Although his daughter was preregistered for Central School in the spring of 1979, Holliday had no record of such registration, and the registration procedure had to be repeated that August. When Holliday testified, she responded to Rev. Bacot's complaints and stated that the records were requested in the spring of 1979, but, as in so many cases, the request for the records had to be made again. According to Holliday, Mrs. Blair, Holliday's former secretary, told her that she had sent off for the records. On registration day, Rev. Bacot accompanied his daughter and made the following observation:
A. Blaaa [sic]. It was pandemonium, it was chaos. I have never seen a school like that.
Q. Well, specifically what are you talking about?
A. People were bananas. Students were milling around, the teachers were milling around, half the people didn't know where they were, not to, all right, not to exaggerate, but I simply asked, you know, my child is new, she is a sixth grader, where can I find out where she is supposed [sic] to be. I don't know. I said to a teacher. I asked another teacher. I don't know. And another teacher, you know, as I mentioned, told me to go look on the board. I go look on the board, finally I went in and Mr. Fortera got my daughter registered or whatever was suppose [sic] to take place. I mean, he got her in a classroom.
Rev. Bacot also complained that his daughter had not been issued textbooks during the first couple weeks of school and was using encyclopedias to do her assignments. When Holliday was asked why textbooks had not been issued, she explained:
A. Teachers received their textbooks two or three days prior to the opening of school. The two years during my administrative position teachers have always issued their textbooks when they felt that the student was ready. Some teachers orientate and teach lesson skills before they issue their textbooks. Teachers and students are geared in activities that are geared to textbook instruction. This is not wasted *1299 time. Six years prior to my administrative position teachers never issued a textbook for the entire school year. Teachers kept one or two sets of books in the classroom and issued the students as they would come in for their class period. At the end of the period these books were picked up to be used for the next class. Students were not permitted to take the books home. If there were any parent that complained about a student not having a textbook the teacher would give him a totebook.
On cross examination, Holliday was asked what her philosophy was on issuing textbooks, to which she answered:
Q. What is your philosophy on issuing textbooks?
A. My philosophy of issuing textbooks is that I leave that in the possession of the teachers. They receive their textbooks the first two or three days prior to school opening and it was left up to them because may [sic] of the teachers like to orientate and teach lesson skills before they issue their books.
According to Holliday, teachers had their textbooks two to three days before school began.
Marcia Bryan, a sixth grade mother, also testified at the hearing. All four of the Bryan children attend public schools in West Point. Bryan was an active member of a volunteer group whose purpose was to enrich and support the public schools of West Point. On August 28, Bryan took her eleven-year old daughter to Central School for registration. She stated that from August 28 until September 10, her daughter did not know who her teachers were and was not assigned any textbooks. Bryan figured that anywhere between 250 to 300 sixth grade students were affected by the scheduling problem. On September 10, she returned to Central and observed the following:
A. I did go back to the school on the 10th because I am involved as an active parent in the volunteer organization. For some reason a lot of people, and I mean a lot of people were calling me and saying, "What is going on?" And I didn't know what was going on.
I called the central office and I asked the superintendent and the assistant superintendent and I said, "Listen, we really have got a problem now. What is happening?" And they were embarrassed and confused. And they said, "We are trying to straighten it out." But, at that point I was frankly concerned about the whole school system. Because community wide this was detrimental to our school. We are talking about maybe, I don't know how many exactly, but 250 to 300 sixth grade students, 600 parents, maybe. And in a community this size when you have got a problem of that proportion it is a big problem.
And I think we will all agree that public education has taken a battering in the last few years. And I didn't like this happening because a lot of people have worked too hard to make education, public education quality and good. So, on the 10th, I, you know, I was upset and nervous and I said, "I will just go to Central School. And I just want to see what is happening. I have heard too much." I went to the school and it was chaotic, very confusing. There were children in the halls. There was no learning going on in classes, so I could not disrupt a classroom. I just wandered in and out and I never saw my daughter, so I didn't really go to find out where she was. I just chatted with teachers that I saw, or said what is going on, how is it. And I just observed.
Some of the teachers were calling rolls and is Joe Smith here, where is Joe Smith, or where is somebody else. They looked to me like they were dealing with an awful lot of paperwork in trying to find children.
After the plaintiff rested its case, Holliday testified in her defense at length. She attempted to counter many of the charges alleged against her by Griffin and Tennyson. She disputed the fact that Tennyson *1300 had ever offered to help her with the scheduling problem prior to her visit on September 9, 1979. As to the charge that she was not proficient in English grammar, Holliday responded:
A. Negroes cannot speak nor teach English. We chop our words. We mispronounce others, so says Mrs. Tennyson. But, I have always done whatever they asked me to do in writing. I remember one report that I had wrong which was the OCR report. And Mr. Griffin called me over and talked to me about it. And he said, "Go back, damn it, and get it right."
Q. The standard of learning and education at Central School has not been maintained as it should have been during your two years as principal.
A. The standard of learning have [sic] been maintained at Central School. Students have been engaged in a variety of activities, programs, clubs, et cetera. Teachers have been engaged in team and area meetings each month. They have also attended in-service workshops which have been enriching to the total school program.
She also attempted to counter the charge that eligible students did not receive their lunch tickets until September 10. She explained the free lunch program as follows:
A. The first week of school students buy or bring their lunch to school. No tickets are issued that first week of school. We were out on September 3rd for Labor Day. We came back September the 4th. Before a child can receive a free lunch ticket he must take home a free lunch application to be filled out and signed by the parent. That lunch form returns to the school. We in turn send it to the central office, to the lunch room supervisor. The lunch room supervisor evaluates the application to determine whether the child is eligible for free or reduced lunch. She then turns, makes a list of those students for free lunch and sends it to the lunch room manager of that school. The lunch room manager takes the list and writes out a ticket for each child on that list. When that process is completed she sends it to the secretary of the school. The secretary distributes those tickets out to the students. This takes several days for this process, sometimes from two to three weeks. But there could have been a few students who did not get a lunch ticket. But if his name was on the list, he did eat.
Several teachers testified on behalf of Holliday. Some of the testimony indicated that each teacher was responsible for obtaining textbooks from the storeroom at the beginning of the school year. One of the teachers, Earnestine Wicks, testified that it was left to each teacher's discretion when to issue textbooks. Her testimony revealed the rather startling school policy:
A. Mr. Rushing didn't believe in text, issuing of textbooks because he said that the, you know, the kids got them and they didn't take them home anyway. And if a parent would call him and ask him why their child didn't have a book he asked us, that if we didn't want to issue our regular textbook to issue that child what he called a tote-book, just something to take home to pacify the parents.
Mrs. Neva Lane, a sixth grade English teacher, had taught school for approximately six years and had served under three principles. She stated that she had never made any comment to Marcia Bryan about conditions at Central School.
Ms. Arteria Evans, a public school teacher for twenty-one years, stated that she had not had any problems with scheduling and did not know of any other problems in the school.
After the defense rested, Dr. Blackston ordered the record typed to allow him a chance to review the testimony in order to render an opinion. He later upheld the reassignment and Holliday appealed to the chancery court.
Upon review of the hearing record per Mississippi Code Annotated § 37-9-113(3) (Supp. 1980), the chancery court upheld Dr. Blackston's ruling concluding:

*1301 The record before this Court clearly reflects a student situation of much confusion for want of adequate scheduling, the primary responsibility of the principal. The subsequent action by the superintendent was not arbitrary and capricious, but rather the fulfilling of his responsibility as superintendent, all of which he was justified in doing so.
It is the opinion of this court that the purpose for which any school district exists is to educate our young, not to provide employment opportunities for adults; that the "pole star" of all school administrators at every level should be that which is in the best interest of the children and their education, a State intent that was clearly anticipated by the conclusion of the reassignment clause in its form contract for publis [sic] school employment.
Citing Calhoun Cty. Bd. of Educ. v. Hamblin, 360 So.2d 1236 (Miss. 1978), Chancellor Brand held that Holliday had been given the opportunity to present "matters in extenuation or exculpation  to present her position ..." and, therefore, the statutory requirements of Mississippi Code Annotated § 37-9-101 (Supp. 1980) had been complied with. The contract executed by Holliday with the school district provided:
That said person accepts employment in the school as indicated above but agrees to reassignment during said scholastic year when it is recommended by the county or district superintendent and approved by the Board of Trustees of said district.
Although this case was decided by the hearing officer on facts found by him which we think were amply supported by substantial evidence, the contract which Holliday executed contemplated that she would be subject to reassignment by action of proper authorities. In our view, courts should be very reluctant to second guess school authorities when reasonably acting pursuant to a solemn contract. Here there is no showing that the reassignment clause in the contract was improperly applied.
We are unable to find that any of Holliday's rights were viollated. Pertinent is the following language excerpted from Dr. Blackston's fact finding:
There was ample evidence to indicate there were scheduling problems and confusion during the opening weeks of school. Parents, teachers and central office personnel were justified in their concerns over these problems. Information concerning new procedures for scheduling pupils was given to all principals in the West Point district during the Spring of 1979. Personnel in the central office were available to any principal for assistance. With this much preparation time, scheduling should not have presented any major problem. It is the opinion of the Hearing Officer that Mr. Griffin was justified in the reassignment of Mrs. Holliday... . While many people are involved in the operation of a particular school, the principal is ultimately charged with the school's successes and/or failures.
Appellant alleges that Dr. Blackston and the chancellor upheld her removal not on grounds of "incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil of [sic] other good cause." While it is true that the chancellor relied heavily upon the fact that Holliday's employment contract specifically provided for her reassignment upon the superintendent's recommendation, he also noted that there had been a great deal of confusion as a result of inept student scheduling. This finding by the chancellor squarely falls within the incompetence category of the statute. See § 37-9-59 (Supp. 1980); Stegall v. Jones, 241 So.2d 349 (Miss. 1970). Accordingly, affirmance is required.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and HAWKINS, JJ., concur.